CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 30 2012

JULIA C. DUDLEY, CLERK
BY:
   DEPUTY CLERK

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ERIC JOSEPH DEPAOLA, | ) | Civil Action No. 7:11-cv-00198 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| JAMES WADE, et al. | ) | |
| | ) | By: Samuel G. Wilson |
| Defendants. | ) | United States District Judge |

This is an action against five employees of the Virginia Department of Corrections ("VDOC") by inmate Eric Joseph DePaola pursuant to 42 U.S.C. § 1983 for their alleged violation of his First and Fourteenth Amendment rights and pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (2006). DePaola brings the action against James Wade, the Red Onion State Prison ("ROSP") food-service director; B. Osbourne, a ROSP food-service worker; Lafayette Fleming, a former ROSP correctional officer; Tracy Ray, the ROSP warden; and John Garman, a VDOC regional director. The suit arises out of the defendants' failure to serve DePaola's meals before sunrise and after sunset during Ramadan in 2010 following DePaola's single refusal to demonstrate his sincerely held religious beliefs by showing them he possessed Islamic religious materials. VDOC has since substantially altered the institutional policy that led to the dispute. The defendants maintain that they have qualified immunity for DePaola's § 1983 damage claims, that RLUIPA does not provide for damages against them, and that DePaola's request for injunctive relief is moot. The court agrees and grants summary judgment to the defendants on all claims except the single claim that the

challenged policy violated DePaola's rights to equal protection, and the court dismisses that claim without prejudice pursuant to 28 U.S.C. §1915(e)(2)(B).[1]

I.

VDOC recognizes a prisoner's right to maintain a diet consistent with his religious beliefs and therefore makes special arrangements to serve Muslim adherents before sunrise and after sunset during the month of Ramadan. As Ramadan nears, ROSP distributes a memo to the prisoners requiring them to fill out a sign-up sheet if they wish to be placed on the Ramadan fasting list. A participating prisoner may choose to receive a vegetarian, Common Fare,[2] or regular diet during the observance. The prisoner has one month to return the sign-up sheet, after which the prison compiles a Ramadan participation list and generates participation cards to hang on cell doors. After Ramadan observance begins, prison employees use the participation cards to distribute the appropriate trays to the appropriate cells before sunrise and after sunset.

In 2009, ROSP served over four hundred Ramadan participants (approximately half the prison population), some of whom, the prison later determined, were not practicing Muslims. Because Ramadan food-service requires the prison to special-order meals and supplies and disrupt its normal schedule by providing meals at atypical hours, ROSP sought a way to limit participation to actual practitioners of Islam. Most Virginia correctional institutions track prisoners' religious faiths by maintaining a "Religious Pass List" documenting which religious

---

[1] DePaola responded to the defendants' motion for summary judgment with a motion for summary judgment of his own. For the reasons stated in this memorandum opinion, the court denies his motion. The court bases its opinion on DePaola's amended complaint. (Am. Compl., E.C.F. No. 10-1.)

[2] The Common Fare diet is designed to meet the nutritional and religious needs of a wide variety of religious groups, including Jews and Muslims. See Madison v. Virginia, 474 F.3d 118, 123 (4th Cir. 2006); Acoolla v. Angelone, No. 7:01-cv-01008, 2006 WL 938731, at *4 (W.D.Va. Sept. 1, 2006).

services prisoners attend. However, because ROSP is a segregation institution,[3] it does not offer group religious services and instead allows cell-confined inmates to view televised religious services and keep approved religious materials in-cell (such as Bibles, Qurans, and prayer rugs). As a consequence, the prison does not maintain a Religious Pass List. Lacking a Pass List by which it might verify a prisoner's faith, ROSP instituted a policy of requiring prospective Ramadan participants to offer officials some indicia of Islamic adherence, such as a Quran, Kufi, or prayer rug. Offenders who did not possess or refused to show religious materials would be deemed insincere in their religious beliefs and removed from the Ramadan participation list.

In 2010 (the year of the events giving rise to this lawsuit), forty-eight percent of the ROSP prison population signed up to participate in Ramadan, including inmate DePaola. After the sign-up window closed, ROSP food-service director James Wade visited individual prisoners to implement ROSP's new policy. Upon arriving at DePaola's cell, Wade asked DePaola to show him a Quran or other material pertaining to his religious faith. Despite having a Quran to show Wade, DePaola flatly refused. Wade informed DePaola that if he would not show any religious materials, then the prison would remove him from the Ramadan participation list.

---

[3] The defendants likely placed DePaola in segregation after he stabbed a prison guard. See DePaola v. Taylor, 7:10cv398 (W.D. Va. Nov. 18, 2011). The court presided at the trial arising from that event, in which DePaola claimed to have been the victim of a guard's excessive force. He overcame the defendants' motion for summary judgment and earned a day in court by lying about the circumstances surrounding his claim. DePaola alleged that prison guards pepper-sprayed him, threw him to the floor, and beat him, all while he "was not resisting nor . . . armed with any weapons of any form." See id. (Am. Compl. 7–8, E.C.F. No. 1). He reasserted that claim, under penalty of perjury, in his brief in opposition to the defendants' motion for summary judgment: "At no time during the . . . use of excessive force was the Plaintiff armed with any weapons, and/or resisting restraint, struggling or a threat." Id. (Pl.'s Resp. Defs.' Mot. Summ. J. 3, E.C.F. No. 37).

At trial, however, the unassailed prison surveillance video showed DePaola retrieve a shank from a hiding place before charging Officer Christopher Dutton. DePaola and Dutton struggled with one another until another guard arrived on the scene and pepper-sprayed DePaola. Only then were the guards able to put DePaola on the ground and forcefully restrain him. At some point during the struggle, Dutton sustained a stab wound. After the jury viewed the surveillance video—which DePaola himself offered as evidence—he changed tactics and admitted that he had been armed with a shank. The jury returned a verdict in favor of the defendants.

3

DePaola remained obstinate, and Wade moved on to check other prisoners in other cells. DePaola alleges that he then retrieved his Quran and unsuccessfully tried to summon Wade back to his cell.

After prison officials removed DePaola's name from the Ramadan participation list, DePaola sought to have food-service worker B. Osbourne and Officer Lafayette Fleming restore DePaola's name to the list. When that effort failed, DePaola filed unsuccessful complaints and grievances, ultimately receiving only his regularly scheduled Common Fare diet.

After Ramadan 2010, VDOC's Inspector General recommended that VDOC management "clarify what is required for verification of religious claims." (See Resp. to Order 2, E.C.F. No. 35-1.) VDOC responded with a memorandum explaining that, in the future, VDOC segregation institutions would not require inmates to have Qurans or other religious items in their possession to show a sincere religious belief. Instead, prison officials would verify a prisoner's sincere religious belief by other means, such as referencing records documenting that a prisoner has viewed religious DVDs, listened to religious CDs, or borrowed religious literature from the prison chaplain.

## II.

DePaola claims that the defendants violated his right under RLUIPA to be free from substantial burdens on his religious exercise.[4] He seeks damages, which he claims are authorized by RLUIPA, and an injunction ordering the defendants "to allow all prisoners whom request to participate in Ramadan to be allowed to do so without restriction as long as said prisoners follow

---

[4] DePaola, with virtually no effort, could have shown his Quran when first asked. Nevertheless, the court has assumed, although it has not decided, that prison officials substantially burdened DePaola's religious exercise by asking him for proof. And the court acknowledges that DePaola's removal from the Ramadan participation list qualifies as a substantial burden on his religious exercise. See Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006).

4

guidelines of such." (Am. Compl. 10, E.C.F. No. 10-1.) VDOC, meanwhile, has instituted a new official policy under which segregation prisoners like DePaola are no longer required to present Islamic materials in order to participate in Ramadan. The court therefore finds that DePaola's claim is moot to the extent that he seeks the remedy of an injunction against the earlier prison policy. And to the extent that he seeks the remedy of damages, the court grants the defendants' motion for summary judgment because RLUIPA does not authorize claims for official or individual capacity damages.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a) (2006). The exception to that standard arises when the government can demonstrate that the imposition of a burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." Id. While RLUIPA provides an avenue for a prisoner to remove (via injunction) a substantial burden on his religious exercise, it "does not authorize claims for official or individual capacity damages." Rendelman v. Rouse, 569 F.3d 182, 184, 189 n.2 (4th Cir. 2009). And, as with all cases presented for federal-court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." White Tail Park, Inc. v. Stroube, 413 F.3d 451, 457 (4th Cir. 2005). There is no actual controversy and "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969).

Under controlling Fourth Circuit precedent, DePaola is clearly not entitled to damages under RLUIPA, and the court will address the issue no further.[5] It is equally clear that DePaola

---

[5] DePaola's complaint characterizes his RLUIPA claims as being "authorized by the spending clause." (Am. Compl. 1, E.C.F. No 10-1.) DePaola's complaint states that he seeks "[c]ompensatory

5

is not entitled to injunctive relief. By instituting a policy wherein offenders are not required to present religious materials to participate in Ramadan, VDOC has mooted DePaola's RLUPA claim by essentially giving him the relief he seeks.[6] In this respect, the issue is no longer "live." See Powell, 395 U.S. at 496. Accordingly, the court will grant the defendants' motion for summary judgment on DePaola's RLUIPA claim. See Rendelman, 569 F.3d at 189 (affirming summary judgment in favor of the defendants because RLUIPA does not authorize official or individual capacity damages and dismissing as moot the plaintiff's claim for injunctive relief).

### III.

DePaola claims that the defendants violated his First Amendment free exercise rights and that he is entitled to injunctive relief and damages to redress those violations. As with DePaola's RLUIPA claim, any claim for injunctive relief under the First Amendment is moot. And, because reasonable officers would not have understood that asking DePaola to show some indicia of his sincere religious belief and removing him from the Ramadan participation list

---

damages in the amount of $50,000 . . . as a result of . . . violations of Plaintiff's U.S.C. rights." Because he also prays for damages for violation of his constitutional rights, the court liberally construes his *pro se* complaint as requesting compensation for RLUIPA violations. See Beaudett v. City of Hampton, 775 F.2d 1274, 1277–78 (4th Cir. 1985).

[6] Although DePaola's requested injunction would order the defendants "to allow all prisoners whom request to participate in Ramadan to be allowed to do so without restriction as long as said prisoners follow guidelines of such," were the court to award injunctive relief, 18 U.S.C. § 3626(a)(1) would constrain the court to craft a considerably more narrow injunction:
>  Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

when he refused cooperate would violate DePaola's free exercise rights, the defendants are entitled to qualified immunity on DePaola's claim for damages.[7]

The First Amendment's Free Exercise Clause, like RLUIPA, prohibits substantial burdens on religious exercise. Lovelace v. Lee, 472 F.3d 174, 198–99 & n.8 (4th Cir. 2006). Under the Free Exercise Clause, "a prisoner has a 'clearly established . . . right to a diet consistent with his . . . religious scruples.'" Id. at 198–99 (ellipses in original) (quoting Ford v. McGinnis, 352 F.3d 582, 597 (2nd Cir. 2003)). "A prison official violates this clearly established right if he intentionally and without sufficient justification denies an inmate his religiously mandated diet." Id. at 199. But in contrast to RLUIPA's compelling governmental interest/least restrictive alternative test, in the case of convicted prisoners the First Amendment permits free exercise restrictions that are "reasonably adapted to achieving a legitimate penological objective." Id. at 200 (quoting Young v. Coughlin, 866 F.2d 567, 570 (2nd Cir. 1989)). Thus, in the case of prisoners, the First Amendment affords prison officials greater latitude than RLUIPA. Id. n.8 (quoting Madison v. Riter, 355 F.3d 310, 314–15 n.1 (4th Cir. 2003)). The "reasonably adapted" test asks:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

---

[7] The defense of qualified immunity is available only to an official sued in his individual or personal capacity, and not to an official sued in his official capacity. Kentucky v. Graham, 473 U.S. 159, 165–68 (1985). In this case, the complaint alleges that Ray and Garman are being sued in their individual and official capacities. The court agrees with the defendants that, in their official capacities, Warden Ray and Director Garman are not "persons" for purposes of § 1983 and thus are entitled to Eleventh Amendment immunity. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).

7

This approach gives deference to "the considered judgment of prison administrators, 'who are actually charged with and trained in the running of the particular institution under examination.'" O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987) (quoting Bell v. Wolfish, 441 U.S. 520, 562 (1979)). It is in this context that prison administrators may appropriately question whether a prisoner's religious beliefs, asserted as the basis for a requested accommodation, are sincere. See, e.g., Morrison v. Garraghty, 239 F.3d 648, 658 (4th Cir. 2001) (finding a constitutional violation because the defendants "never evaluated the sincerity of [the prisoner's] beliefs" as they would have for other inmates' requests for religious accommodations); see also Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) (recognizing sincerity-testing in the context of RLUIPA).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The inquiry is twofold: a court should determine whether any right was violated and also whether that right was clearly established at the time of the alleged violation. See Miller v. Prince George's Cnty., 475 F.3d 621, 626–27 (4th Cir. 2007). A court conducts the "latter inquiry by determining whether a reasonable officer would have understood that his conduct violated the asserted right." Id. at 627. The court may exercise discretion in deciding which of the two prongs to address first. Pearson v. Callahan, 555 U.S. 223, 236 (2009); see also id. at 237–45 (explaining that this approach eliminates the need for courts to address difficult and "essentially academic" constitutional questions).

8

The Supreme Court has explained that the operation of qualified immunity "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. 635, 639 (1987). "For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which *any* action that violates that Clause (no matter how unclear it may be that the *particular* action is a violation) violates a clearly established right." Id. (emphasis added). But determining, at that level of generality, whether a law is clearly established would "bear no relationship to the 'objective legal reasonableness' that is the touchstone of the [qualified immunity inquiry]" and it "would destroy 'the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties,' by making it impossible for officials 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" Id. (second alteration in original). Thus, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[8] Id. at 640. To determine, then, whether the official should have known that his action violated a right, the court must examine the facts "at a high level of particularity." Campbell v. Galloway, 483 F.3d 258, 271 (4th Cir. 2007).

Public officials are not liable for making "bad guesses in gray areas," Maciariello v. Sumner, 973 F2d 295, 298 (4th Cir. 1992), and there are appreciably fewer analytical bright lines in the prison context where the law gives prison officials some latitude, and the decision-making process permits the balancing of various interests, see Benson v. Allphin, 786 F.2d 268, 276 (7th

---

[8] "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citation omitted).

9

Cir. 1986) (noting that a constitutional rule "involving the balancing of competing interests" is "so fact dependent that the 'law' can rarely be considered 'clearly established'") (superseded on other grounds by amendment to the Federal Rules of Civil Procedure); see also Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 320 (4th Cir. 2006) (recognizing, in the context of First Amendment speech, the difficulty of finding a clearly established right because interest-balancing is required) (citing McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998)); Torbeck v. Zoon, No. 96-1962, 1997 WL 532496, at *2 (4th Cir. August 29, 1997) (table decision) (recognizing the same in the context of procedural due process).

With those precepts in mind, the court turns to the question of qualified immunity and concludes that reasonable officials under the circumstances present here would not have understood that their conduct violated DePaola's free exercise rights. Defining the issue at the requisite level of particularity, the relevant inquiry is not simply whether prison officials denied DePaola's right to participate in Ramadan, but rather, in light of the clearly established principles governing the service of religious meals in correctional institutions, whether an official could have reasonably believed it lawful to ask DePaola to demonstrate the sincerity of his religious belief by showing religious materials and to strike him from the Ramadan participation list when DePaola refused to cooperate. While those established principles hold that there is a First Amendment right to participate in Ramadan, they also hold there is *no* First Amendment violation[9] when a prison policy is reasonably adapted to achieving a legitimate penological

---

[9] Indeed, prison policy manuals are replete with regulations regarding religious meals, and the case reporters are awash with opinions regarding the propriety of those regulations. See, e.g., (Pl.'s Mot. Summ. J. 31–66, E.C.F. No. 32) (showing the VDOC Food Service Manual and the VDOC Operating Procedure on Offender Religious Programs); Abdulhaseeb v. Calbone, 600 F.3d 1301 (10th Cir. 2010); Nelson v. Miller, 570 F.3d 868 (7th Cir. 2009); Gadson v. Iowa Dep't of Corr., 551 F.3d 825 (2009); Lovelace, 472 F.3d at 199–200. Quite often, courts find that the regulations in question were "reasonably adapted to achieving a legitimate penological objective." Baranowski v. Hart, 486 F.3d 112 (5th Cir. 2007) (holding that a prison's denial of a Kosher diet was reasonably related to the legitimate penological

objective, and that prison administrators may question whether a prisoner's belief, asserted as the basis for a requested accommodation, is authentic.

Faced as they were with the penological objectives of controlling costs and minimizing operational disruptions, ROSP officials implemented a policy meant to realize those objectives by limiting Ramadan participation to sincere Muslims. That policy merely required a prisoner claiming a right to participate in Ramadan to present some indicia of his sincerely held religious belief. It is unclear (and the court need not decide) whether close judicial scrutiny would reveal that particular means of sincerity-testing to be constitutionally sustainable. But it is not unclear that it is permissible for prison officials to adopt policies designed to control costs, prevent operational disruptions, and verify the sincerity of religious beliefs—even when those policies are in friction with free exercise rights.

Here, the decision to remove DePaola from the participation list was neither punitive nor arbitrary, but was in furtherance of legitimate penological objectives. A reasonable official would not have understood "in light of pre-existing law" that implementing a policy designed to indentify actual Muslim adherents would violate the Free Exercise Clause of the First Amendment. The policy the defendants implemented transgressed no bright lines. Accordingly, the defendants are entitled to qualified immunity, and the court will grant summary judgment on DePaola's First Amendment claim.

---

interest containing cost and running a simplified food program); DeHart v. Horn, 390 F.3d 262 (3d Cir. 2004) (holding that a prison's denial of a Buddhist diet was reasonably related to the prison's legitimate penological interest in efficient food provision); Williams v. Morton, 343 F.3d 212 (3d Cir. 2003) (holding that a prison's denial of *Halal* meat was reasonably related to the legitimate penological interests of simplified food service, security, and cost control); Cooper v. Lanham, No. 97-7183, 1998 WL 230913 (4th Cir. 1998) (table decision) (holding that a prison's denial of Kosher meals was reasonably related to the legitimate penological interest of conserving and managing prison resources).

11

## IV.

DePaola claims that defendants Ray, Garman, Osbourne, and Fleming, through their individual actions, displayed "deliberate indifference and contributed to the above described violations of the Plaintiff's [constitutional and statutory rights]."[10] (Am. Compl. 9, E.C.F. 10-1.) Essentially, DePaola claims that the defendants violated the First Amendment by not returning his name to the Ramadan participation list when DePaola indicated that he was prepared to comply with prison policy. The court finds that a reasonable official under the circumstances these four individual defendants faced would not have known that his conduct violated the First Amendment. The defendants are therefore entitled to qualified immunity on the claim.

Because the court must examine the facts "at a high level of particularity," Campbell, 483 F.3d at 271, and because the particularized facts are unique to this claim, the court will recite them here. First, DePaola's allegations regarding food-service worker Osbourne: on July 31st, after Wade removed DePaola from the Ramadan participation list, DePaola directed an "Inmate Request for Information/Service" to Osbourne, asking whether his name was on the Ramadan list. (Pl.'s Mot. Summ. J. 106, E.C.F. No. 32) ("I still want to participate in Ramadan my name should still be on the list is it?"). Osbourne responded on August 9th, explaining that DePaola's name was not on the list because he failed to fulfill his obligations under ROSP's Ramadan

---

[10] The court notes that DePaola's own submissions are in diametric opposition to the proposition that prison officials were or are indifferent to his religious rights. He has submitted documents showing his request for and placement on the non-pork diet, his subsequent request for and placement on the Common Fare diet, a dozen pages of the prison's food-service manual pertaining to Ramadan and the Common Fare diet, two-dozen pages of VDOC operating procedures pertaining to religious services, seventy-two Power Point slides meant for staff training pertaining to Islam, a twenty-page "Handbook of Muslim Beliefs and Practices for Virginia Correctional Institutions," fifteen pages of DePaola's administrative grievances regarding his Ramadan participation and their increasingly detailed official responses, a form showing his cell reassignment due to DePaola's complaint that his cell was unsuitable because a stairwell obscured his view of a television showing religious services, and a subsequent (unsuccessful) demand for a new cell because his bed was permanently positioned such that it allegedly hindered his ability to pray. (Pl.'s Mot. Summ. J. 11–120, E.C.F. No. 32.)

policy. Also on August 9th, as Osbourne was distributing Ramadan participation cards, DePaola allegedly showed Osbourne religious materials and asked Osbourne to return DePaola's name to the participation list. According to DePaola, Osbourne allegedly said "he would check on it." (Am. Compl. 6, E.C.F. No. 10-1); but see (Osbourne Aff. 1–2, E.C.F. No. 16-3) ("I do not recall offender Depaola [sic] showing me any religious materials for Ramadan participation."). On August 12th, DePaola directed another "Inmate Request for Information/Service" at Osbourne and asked him whether DePaola had shown Osbourne an Islamic pamphlet. It is unclear whether Osbourne saw the inquiry, but Wade responded to it by explaining the prison's policy and that it was correctly applied.

With respect to Fleming, DePaola alleges that between July 27th and August 12th, DePaola "requested and pleaded (verbally) with Def. Fleming . . . to help Plaintiff get back on the Ramadan list approx. 4 times." (Am. Compl. 7, E.C.F. No. 10-1); but see (Fleming Aff. 1, E.C.F. No. 16-4) ("I did not recall speaking to offender Depaola [sic] about being placed on the Ramadan fasting list while I was at ROSP. Nor do I recall telling Depaola I would check into it as he alleges in his lawsuit. Also I was not aware offender Depaola was a Muslim."). DePaola also filed an "Emergency Grievance" on August 9th explaining that Wade had removed him from the list for not showing religious materials, which Fleming responded to later that day by advising DePaola to use the proper form for his complaint.

Unhappy with those responses, DePaola filed an August 12th "Regular Grievance" with Warden Ray, explaining that Wade removed him from the participation list, that he had since shown Osbourne religious materials, that he wanted to participate in Ramadan, and that he wanted $50,000 in damages and for Wade to be fired. Warden Ray responded at length on or

13

around October 12th[11] by summarizing Ray's own investigation of the matter, explaining why DePaola was removed from the participation list and the reasons for ROSP's policy, and finding no policy violation. On October 12th, DePaola appealed Ray's decision to Regional Director John Garman. Garman responded a week later by summarizing DePaola's complaint, explaining that prison staff did not violate prison policy, and upholding Ray's decision.

As noted, there are appreciably fewer analytical bright lines in the prison context where the law gives prison officials some latitude and the decision-making process permits the balancing of interests. DePaola contends that he had a right to be returned to the Ramadan participation list despite his earlier refusal to show that he belonged on it. Whether his contention is correct is debatable, and the court does not decide it here. The court does decide, however, that the decision not to reinstate DePaola after he retreated from his initial refusal to demonstrate the sincerity of his religious belief was not squarely on the wrong side of a well-defined line. The court therefore finds that officials faced with the discrete sets of circumstances present here could have reasonably believed it lawful to leave DePaola off the Ramadan list after he was removed based on his refusal to demonstrate the sincerity of his religious belief. By much the same reasoning as in Part III, then, the court finds that the defendants are entitled to qualified immunity and will grant their motion for summary judgment on DePaola's claim of deliberate indifference to his First Amendment rights.

V.

DePaola claims that the defendants' conduct violated his "Fourteenth Amendment . . . right to free from discrimination" because other religious groups are not subject to sincerity

---

[11] Ordinarily, ROSP responds to inmate grievances within thirty days. See (Pl.'s Mot. Summ. J. 116, E.C.F. No. 32.) In this case, the prison gave DePaola a "Notice of Continuance" (pursuant to Operating Procedure 866.1) in order to further investigate the claim. (Taylor Aff. 9, E.C.F. No. 16-5.)

14

testing. (Am. Compl. 8–9, E.C.F. No 10-1.) Because DePaola has failed to plead the requisite facts in support of his claim, the court will dismiss it pursuant to 28 U.S.C. § 1915(e).

Section 1915(e) of Title 28 mandates that in proceedings *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim on which relief may be granted." In order to state a claim for a violation of the Equal Protection Clause, a plaintiff must demonstrate that he has been treated differently from other similarly situated parties and that the disparate treatment was a product of purposeful discrimination. Morrison, 239 F.3d at 654 (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985)). Only once this showing is made should a court proceed to determine whether the disparate treatment can be justified under the requisite level of scrutiny. Id. In addition, "to state a claim upon which relief may be granted, [a plaintiff] must allege facts sufficient to overcome the presumption of reasonableness applied to prison policies." Veney v. Wyche, 293 F.3d 726, 732 (4th Cir. 2002).

Despite having filed nearly two hundred pages of documents in this action, DePaola has failed to satisfy that burden and indeed has scarcely argued his equal protection claim. The only support the court can discern for DePaola's claim is his statement that "No other prisoners wishing to participate in any other religious observance are required to by policy to possess related religious materials and/or show them to participate." Not only is that assertion conclusory,[12] it is flatly contradicted by Chapter 4, Part V.E. of the VDOC Food Service Manual that DePaola himself attached to one of his filings. The manual specifically requires prison

---

[12] To state an adequate claim for relief, the pleadings must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (citation omitted). While the court must accept the claimant's factual allegations as true, Hemi Grp., LLC v. City of N.Y., 130 S. Ct. 983, 986–87 (2010), this tenet is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

15

officials to inquire into and "locate evidence" regarding the sincerity of *all* offenders' religious beliefs when they apply for a prison's religious diet. (Pl.'s Mot. Summ. J. 33, E.C.F. No. 32.) The manual further explains that the Passover, Ramadan, and Nation of Islam Month of Fasting menus are "available only to offenders who require special religious diets . . . and are for accommodating their sincere religious practices." (Pl.'s Mot. Summ. J. 36–38, E.C.F. No. 32.) Those policies do not demonstrate disparate treatment and in fact demonstrate the opposite. Even the most liberal reading of DePaola's complaint and other filings offers no hint of specific, non-conclusory factual allegations in support of his equal protection claim. Accordingly, the court will dismiss the claim pursuant to 28 U.S.C. § 1915(e)(2)(B).

## VI.

For the reasons stated, the court will enter summary judgment as to DePaola's RLUIPA and First Amendment Claims and will dismiss DePaola's equal protection claim.

The clerk is directed to send a copy of this memorandum opinion and the accompanying order to the parties.

**ENTER**: This 30th day of March 2012.

UNITED STATES DISTRICT JUDGE